UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
RUPAL MEHTA, M.D.,

                            Plaintiff,                                    **COMPLAINT**

        -against-

UNIVERSITY OF ROCHESTER MEDICAL                          (Jury Trial Demanded)
CENTER,

                            Defendant.
-----------------------------------------------------------------x

        Plaintiff, Rupal Mehta, M.D., by her attorneys Kaiser Saurborn & Mair, P.C., as and for

her complaint against defendant, alleges as follows:

## PARTIES AND VENUE

        1.      Plaintiff, Rupal Mehta, M.D., is a resident of the State of New York.

        2.      Defendant, University of Rochester Medical Center ("URMC"), is a private

nonprofit research university and academic medical center.  Its principal place of business is in

the City of Rochester, New York.

        3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that

one of the claims asserted herein arises under the False Claims Act (31 U.S.C. § 3730(h)).

        4.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391, in that it is

the District in which the defendant resides and the District in which a substantial portion of the

events giving rise to the claims asserted herein occurred.

## INTRODUCTION AND OVERVIEW OF CLAIMS

        5.      This case is brought pursuant to the anti-retaliation provisions of the False Claims

Act (31 U.S.C. § 3730(h)) and New York Executive Law § 296.

6.      The federal National Institutes for Health ("NIH") award career development

grants, including K08 grants, to highly-accomplished physician research scientists in the

academic medical community.  The purpose of the award is: (i) to enable crucial medical

research to be performed that frequently leads to improved treatment options for patients; (ii) to

help ensure that a diverse pool of highly trained scientists is available in appropriate scientific

disciplines to address the Nation's biomedical, behavioral, and clinical research needs; and (iii) to

enable research scientists to develop their careers by having 75% of their work time at the

academic medical center protected for performing research.  As a condition of awarding,

transferring and continuing to pay K08 grants, the academic institution receiving the funding

must undertake and thereafter certify to the NIH on at least an annual basis that at least 75% of

the professional time of the physician-scientist awardee of the grant has been and will continue

to be protected for the NIH-funded research.

7.      This case arises from the actions of Dr. Bruce Smoller, the Chair of the

Department of Pathology at URMC, who lured plaintiff, a highly accomplished physician

research scientist, to his department in order to fulfil the Dean's mandate of recruiting physician-

researchers with highly prestigious NIH research grants.  Despite making express promises to

Dr. Mehta during the recruitment process that he would honor the NIH grant conditions requiring

protection of 75% of her time for her research, he and his division heads almost immediately

began requiring her to spend 50% to 75% of her time handling clinical duties because of gross

under-staffing in the department and egregious mismanagement and lack of adequate systems to

ensure that autopsies and other clinical work could be performed timely and efficiently.

8.      Smoller also immediately lost any incentive to honor the terms of the NIH grant

award after he succumbed to internal pressure to reassign Dr. Mehta's NIH grant funding from

2

the Pathology Department to the Center for Neural Development and Disease (later renamed as the Center for Neurotherapeutics Discovery) ("CND"), a financially failing research center within URMC that the administration was seeking to shore up financially.  This administrative reassignment would also apply to any subsequent NIH or other grants won by Dr. Mehta, thereby dis-incentivizing Smoller from supporting her research and career development going forward. The situation was further exacerbated by Smoller's own misunderstanding of the NIH grant process, which required his department to fund between 60% and 70% of Dr. Mehta's salary from its own funds, notwithstanding only 25% of her time should have been available for clinical and teaching duties.

9.      Over the course of the following two years, Dr. Mehta was forced to engage in a continuous struggle with Smoller and his departmental leaders in an unsuccessful effort to force Smoller to honor her NIH-mandated research time.  As a result of these efforts, Smoller repeatedly retaliated against Dr. Mehta including: making it clear to her in the summer of 2017 that he will not support her application for promotion; conditioning his support for other grant applications on her acceptance of his violations of the NIH protected-research requirement; manufacturing false performance criticisms of her clinical work; and acting abusively towards her based on her attempts to obtain compliance with the terms of her NIH grant.

10.     In the fall of 2017, Dr. Mehta was advised by external NIH-funded scientists and a senior NIH official that URMC's failure to provide her the required protected research time amounted to fraud.  She was also presented with a university audit form that required her and Smoller to certify that 75% of her professional time was being protected for research and expressly stated that their certification was required to enable the University to certify to the NIH that it was meeting this condition of receiving the grant funds.  She initially resisted signing the

3

form and, when further pressed, signed it with a handwritten disclaimer that her time was not being protected according to NIH guidelines.  Smoller was furious and immediately withdrew his support for Dr. Mehta's new grant application until she relented and signed another copy of the form without the notation.

11.    Dr. Mehta escalated her complaints to the most senior levels of the University administration with a series of meetings with URMC's Vice Provost and multiple Associate Deans culminating in a meeting on March 26, 2018 with the University Senior Associate Dean for Inclusion and Culture Development.  These complaints directly and immediately resulted in Smoller deciding not to renew her four-year faculty appointment and issuing a formal letter of non-renewal of this appointment in April 2018.  Notably, in the non-renewal letter Smoller expressly acknowledged that his decision was based on their disagreements over fulfilling the NIH's 75% protected-research requirement.

12.    Interwoven with Smoller's refusal to abide by the NIH protected-research conditions was his mistreatment of Dr. Mehta because of her gender and race as a woman of Asian descent.  For example, during three of his meetings alone with Dr. Mehta in which she complained that her NIH-mandated research time was not being protected, Smoller leaned back in his chair, thrust his crotch toward Dr. Mehta and told her in a menacing tone of voice to "suck it."  On a separate occasion, he suggested to Dr. Mehta that she consider dating one of the senior faculty members in the department and suggested that her life may be "a lot easier" if she did so. He also repeatedly told her that she should "learn the game."

13.    Ultimately this case is about the powerful Chair of an academic medical department at URMC being "untouchable" and unaccountable for his illegal actions in committing blatant fraud against the NIH and unlawfully retaliating against Dr. Mehta when she

refused to accept his fraud and gender-motivated abusive behavior.  Dr. Mehta complained to the highest levels of URM's administration but they were unwilling to intervene in any substantive manner to protect a junior faculty member from being abused and refused to ensure that the NIH's express conditions for paying over $700,000 were honored.  The case, quite simply, is about absolute power being abused absolutely at an institution whose "Values and Culture" statement include ICARE -- an acronym for Integrity, Inclusion, Compassion, Accountability, Respect and Excellence -- and whose stated mission purports to include the conducting of research that is designed to find new therapies to "save lives and improve human health locally, in the region, and across the globe."

## FACTS GIVING RISE TO THE CAUSES OF ACTION

### A.   Dr. Mehta's Educational Background and Highly Accomplished Career as a Physician-Scientist

14.     Dr. Mehta completed her residency in Anatomic Pathology and a fellowship in Neuropathology at the University of California at Los Angeles and subsequently completed a visiting fellowship at Indiana University Alzheimer's Disease Center.  In 2011 Dr.  Mehta joined the faculty of the Department of Pathology at the University of Maryland School of Medicine as an Assistant Professor.

15.     Dr. Mehta's research focuses on cerebrovascular anatomy and pathophysiology of stroke, cerebral small vessel diseases and dementias.  Her research mission is to identify novel tissue markers to facilitate diagnosis of diseases associated with vascular dysfunction, dementias and brain aging.  She is also board-certified in anatomic pathology and neuropathology. Her research expertise and unique combination of prior clinical experience are in niche areas of public health.  She transferred to University of Rochester, in part, due to the University having announced its mission and strategic plan of opening and expanding a Neurorestorative Institute

in 2015.

16.     Dr. Mehta's research has been recognized through multiple prestigious awards, including those sponsored by USPHS, United States Navy/Marine Corp, Microcirculatory Society, Patent and Trademark Office Society and the American Association of Neuropathologists, and has been published in numerous peer-reviewed scientific journals such as Science, Stroke, Annals of Neurology, Journal of Neuropathology and Experimental Neurology, and Journal of Patient Safety.

17.     In 2014, while an Assistant Professor at University of Maryland School of Medicine, Dr. Mehta was awarded a prestigious K08 career development research grant from the NIH to support her laboratory research as Principal Investigator in a lab that investigates various aspects pertaining to neurovascular diseases and stroke.

**B.     URMC's Pathology Department**

18.     Smoller was hired as Chair of URMC's Pathology Department in July 2014.  He inherited a department that was plagued with operational problems and dysfunction on the clinical side.  One of its divisions – the Autopsy Division – was responsible for performing all autopsies for Strong Memorial Hospital in Rochester.  However, due to persistent under-staffing, incompetence of its administrators, uncoordinated expansion of work, dysfunctional organization and a lack of basic systems routinely utilized by other autopsy departments, there were persistent backlogs in delivering autopsy results.  In July 2015, a year after Smoller took over the department, these problems spilled into the open with a series of press reports describing delays of many months before autopsy reports were made available to families.

19.     The Pathology Department also persistently ranked poorly among its peers in obtaining research funding, including prestigious federal NIH research grants.  In an internal

email, Smoller lamented that his department ranked 49th out of 87 on the NIH grant ranks of pathology departments.  Smoller was therefore given a mandate by the Dean of URMC to "build up the funding rates" of his department by bringing in more NIH research grants.

**C.**     **Dr. Mehta's Recruitment to URMC Pathology Department by Smoller**

20.     As part of his effort to fulfil the Dean's mandate of bringing in research funding, beginning in [the spring] of 2015 Smoller began recruiting Dr. Mehta to join the pathology Department faculty as a tenure-track Assistant Professor and transfer her NIH research grant and laboratory to URMC.  The grant had a cumulative value of more than $715,000.

21.     During the recruitment process, Dr. Mehta discussed at length and on multiple occasions with Smoller the strict NIH grant requirement for K08 grants that 75 percent of her professional time be protected for research and Smoller confirmed verbally and in email communications with Dr. Mehta that he would respect this requirement.  Indeed, during his discussions with Dr. Mehta, Smoller acknowledged that "not honoring the K08 grant would be illegal." He also represented in emails to Dr. Mehta that, in order to implement this obligation, her clinical duties for the department would not exceed one week per month of total service for the autopsy and neuropathology divisions on a combined basis.

22.     Smoller also committed that the department would provide an additional $700,000 in financial support for Dr. Mehta's lab over the course of the four-year term of her initial appointment, including for the hiring of a dedicated technician.

23.     During the pre-hiring discussion Smoller also informed Dr. Mehta that, based on her record, he intended to promote her to Associate Professor within the first year. He also indicated that he would enthusiastically facilitate, mentor and coach her on the path to obtaining tenure at the institution.

24.    On June 29, 2015, Dr, Mehta formally accepted the position at URMC.  Her primary appointment was to the Department of Pathology with a Secondary appointment to CND where her research laboratory would be housed.  By mutual agreement, Dr. Mehta split her time between URMC and her previous University during the first six months until her new license, credentialing and grant transfer applications were processed and until she could begin moving her laboratory over to URMC.

25.    In a July 7, 2015 letter of institutional commitment from Smoller to the NIH in support of the transfer of her K08 research grant to URMC, Smoller made the following commitments to the NIH in writing:

- Dr. Mehta "will have, at minimum, 75% protected time for her research activities and career development, with the remaining time devoted to diagnostic work focusing primarily on stroke and vascular disease."
- Dr. Mehta will have an independent laboratory of 4,500 square feet as well as furnished office space at [CND]."
- Dr. Mehta has received a startup package of $700,000 from URMC in order to "begin her own lab, purchase equipment and hire a dedicated technician."

26.    In all pre-hiring and initial post-hiring discussions with Dr. Mehta, Smoller also indicated to Dr. Mehta that her NIH grant funds would be received and utilized by the Pathology Department, notwithstanding that her laboratory would be housed in the CND.

**D.    Smoller's Decision to Allow Dr. Mehta's Grant to be Reallocated to a Financially Failing Center within URMC and Discovery that his Department Must Pay 60% of her Salary**

27.    Unbeknownst to Dr. Mehta at the time, shortly after her hiring Smoller succumbed to internal administrative pressures from Stephen Dewhurst, URMC's Vice Dean for Research**,** to help the financially-struggling CND by agreeing that Dr. Mehta's NIH grant would be allocated to CND instead of the Pathology Department.  However, it was only after Smoller agreed to this reassignment of funds that he discovered that the reassignment would result in the

internal "credit" for the research award and resulting publications within URMC going to CND

and not to his department.  This was reflected in an email dated August 19, 2015, from Smoller

to CND Director Harris Gelbard, in which Smoller lamented having utilized "capital" with the

Dean without having gained any benefit for his department:

> [I]f the grant resides in your institute, does the [Pathology]
> department not get the "credit" for such, in which case I have just
> spent considerable capital from the Dean [in reference to the
> $700,000 University startup package] towards something that does
> not result in a gain for the department…. I am asking because in
> all honesty, I do not know, this being my first venture into this
> territory.

28. Moreover, at the time Smoller hired Dr. Mehta, Smoller was unaware of the

extent to which his department would be required to fund Dr. Mehta's salary and benefits.  In

January 2016, Dr. Mehta learned that Smoller – as a non-research doctor who had recently

assumed the position of departmental Chair – had mistakenly believed when he hired her that her

NIH grant would directly pay for 75% of her salary corresponding to the 75% protected research

time it required for her NIH-funded research.  In reality, however, the terms of the NIH grant

required that URMC -- and therefore Smoller's department -- fund more than 60% of Dr.

Mehta's salary from unrestricted departmental funds.

29. Upon information and belief, as a result of Smoller's discovery of both the

financial support his department was required to provide for Dr. Mehta's salary and the lack of

credit it would receive for her NIH grant, Smoller decided that he would not honor the NIH

requirement of 75 protected research time and instead would utilize the majority of Dr. Mehta's

time to address the under-staffing and other persistent problems with the clinical operations of

his department.

E.      **The Increase in Dr. Mehta's Clinical Workload and Smoller's Unwillingness to Honor URMC's Legal Obligation to Protect 75 Percent of Dr. Mehta's Time**

30.     After Dr. Mehta began working at URMC she almost immediately discovered that the Autopsy division was woefully understaffed and badly mismanaged. Indeed, simultaneously with her hiring, the former director of the division, Bruce Goldman, was forced to step down due to the extent of the problems.

31.     During late 2015 and early 2016, Smoller and the interim director of the Autopsy Division (and Vice Chair of the department), Brendan Boyce, increasingly required Dr. Mehta to perform clinical work that required vastly more than 25% of her time in an effort to compensate for the under-staffing and other well-known workflow problems in the autopsy division. They also increasingly pressured her to spend dozens of hours a week helping to manage the autopsy service and forced her to perform many administrative tasks that required dozens more hours a week.

32.     The staffing and workflow problems in the Autopsy Division included, but were not limited to, the following:

        a.      The autopsy division was grossly understaffed with high turnover and frequent vacancies of technician staff;

        b.      Pathology slides were routinely mislabeled and/or broken when delivered to pathologists or were delivered without containing tissue or were lost and never delivered at all requiring new slides to be created;

        c.      The departmental electronic system for recording, managing and tracking autopsies was inefficient, ineffective and outdated in comparison with other morgues and autopsy cases and autopsy results were required to be manually entered and re-entered at various stages by residents, faculty and staff;

10

d.     Autopsy data was frequently unlabeled or mislabeled.

e.     Overcrowding by old specimens caused significant difficulties in identifying new specimens for processing, difficulties in locating space to store newly processed specimens and difficulties in retrieving partially analyzed specimens that needed further workup.

f.     Routine mistakes and delays in specimen labeling and identification resulted in excessive amounts of time required to search for specimens and required redundancy of technical and professional work performed.

g.     Despite the issues above, Smoller was actively engaged in expanding the revenue streams, activities and workflow of the Pathology Department.

33.     An internal email distributed by Boyce on January 21, 2016, to the autopsy division and residents in the Pathology Department candidly admitted many of these departmental problems:

> As you all know, Dr. Goldman stepped down as autopsy director at the end of December and I will be serving as acting director until Dr. Dignan takes over the position in July. Dr. Rupal [Mehta] joined the service last year and has been experiencing, like me, some of the issues that are hindering efficient and professional handling and sign out of autopsies in our department. These include delays in completing gross descriptions, cutting specimens and submitting cassettes to histology, cutting and staining sections in histology, reading slides and putting microscopic descriptions into reports, cutting brains, reading brain sections and getting microscopic descriptions into reports, residents meeting with faculty to review clinical histories and gross descriptions, resident delays putting microscopic descriptions into reports and meeting with attendings to sign out reports, reading additional slides or special stain slides and adding descriptions into reports for completion. Each of these steps can result in a delay of up to one week, which [is] not acceptable…. We are instigating a culture change [which] should … give us a service record of which we can be proud and not embarrassed by. We owe this to the physicians who request the autopsy and to the family members of the deceased…." (Emphasis added)

11

34.     In addition to the excessive technical and professional work required to manage and overcompensate for organizational issues while on service, routine delays in delivery of autopsy and neuropathology records and slides often resulted in delivery of case material to Dr. Mehta after she had rotated off the service. This required her to be regularly available during both "on-call" and "off-call" service times, including for routine operational "emergencies," and resulted in her clinical work encroaching even further into the time that was required by the NIH to be allocated as protected research time.

**F.     Smoller Begins Retaliating Against Dr. Mehta for Trying to Obtain Compliance with the Protected Research Time Requirements of her NIH Grant**

35.     During January and February of 2016, Dr. Mehta made multiple requests (both verbally and in emails) to Boyce and Smoller that her clinical and teaching schedule be reduced to meet the protected research time requirements of her NIH grant.

36.     During January and February 2016, Dr. Mehta also raised her concerns about her clinical workload with CND Director Harris Gelbard, to whom she reported in her secondary faculty appointment with CND where her laboratory was housed.  She told Gelbard that her clinical obligations were interfering with the research she was conducting at CND and were in violation of the terms of the NIH grant being received by CND.  Gelbard agreed with her concerns.

37.     On March 1, 2016, at Gelbard's suggestion, Dr. Mehta emailed Boyce and Smoller reiterating her requests that her protected research time be respected and informing them that she had already been required to work 145 clinical hours in January and 163 clinical hours in February – far in excess of the amount permitted by the NIH grant.  As a result, and based on instruction from Gelbard, she pointed out that she had "already fulfilled [her] clinical effort for the current academic year."  However, as a concession to the "desperation" of the autopsy

service, Dr. Mehta agreed in her email to forward availability for the April-June quarter but warned that "[i]n order to comply with my NIH/K08 requirements, I can only commit to 4 days/month of clinical service work on autopsy and/or neuropathology beginning July 1, 2016."

38.     Gelbard also attempted to schedule a meeting with Smoller to discuss Dr. Mehta's need for protected research time but Smoller resisted these attempts. Instead, on March 4, 2016, at Gelbard's behest, he and Dr. Mehta instead met with Boyce.  At this meeting, Gelbard raised his and Dr. Mehta's concerns regarding her protected research time and attempted to help work out a reasonable clinical schedule.

39.     Smoller's reaction to the meeting was almost immediate.  In a letter dated five days after the Gelbard meeting, Smoller reprimanded and threatened Dr. Mehta.  The letter began with a warning to Dr. Mehta that "your time at URMC is not off to a good and productive start."  It then attempted to document a false version of the clinical workload she was being asked to perform, claiming it amounted to only 32.5 hours per month if she worked efficiently rather than in excess of 150 hours per month as documented by Dr. Mehta.  The letter also strongly criticized Dr. Mehta for discussing her improper clinical workload in the Pathology Department with Gelbard and Marc Halterman at CND -- falsely claiming that Halterman was not one of her official mentors under her K08 grant – and prohibited her from discussing any of her future concerns about her schedule with anyone outside of the Pathology Department.  The letter closed with a further unambiguous threat that she must continue to perform the workload she had been performing if she wanted to have a future at URMC: "[I]t will be important for you to develop a strategy that will enable you to complete your monthly single week of service in an appropriate amount of time to budget for lectures to be given to various audiences that are required of all faculty members and to conform with departmental policies regarding

departmental citizenship."

40.     When Dr. Mehta discussed Smoller's letter of reprimand with Gelbard and
Halterman, they were both shocked and told Dr. Mehta that in their view it constituted
"unethical" conduct on Smoller's part.  Gelbard also informed Dr. Mehta that, based on his
interactions and communications with Smoller, he believed Smoller did not understand the
challenges of a researcher or proper grant administration.  He also told Dr. Mehta and Halterman
that Smoller had initially believed Dr. Mehta was a "cash cow" for his department" but later
came to realize this was not the case because of the grant transfer and requirement that the
Pathology Department subsidize her salary for her research time.

41.     However, over the coming months it became clear to Dr. Mehta that – while
sympathetic to her position – Gelbard was unwilling to pursue her concerns within the URMC
administration, presumably because her NIH grant provided funding desperately needed by his
center which he did not want to jeopardize.

42.     Following the letter of reprimand Smoller and Boyce continued to require Dr.
Mehta to work a clinical schedule that averaged approximately 75% of her work time.  The
ongoing problems in the Autopsy division were also compounded by staffing issues in the
department's Neuropathology division in which Dr. Mehta was also required to perform clinical
services.  Beginning in the spring of 2016, the director of that division, Mahlon Johnson,
suffered multiple personal health and family health issues that required Dr. Mehta to provide
extra coverage on various occasions as she was the only other faculty member assigned to work
in that division.

43.     Between April and early July 2016, Dr. Mehta had at least five meetings alone
with Smoller at which she complained about the extreme encroachment of her clinical duties on

14

her NIH-protected research time.  Smoller was at times apologetic – telling her the department

needed her help and her loyalty and that he would make it up to her later – and at other times was

abusive and threatening to her and her career.  During one meeting with Dr. Mehta alone in his

office in or about June or early July of 2016, Smoller leaned back in his chair, thrust his crotch

toward Dr. Mehta and told her to "suck it" in a menacing tone of voice. On a separate occasion,

he suggested to Dr. Mehta that she may consider dating one of the senior faculty members in the

department and suggested that her life may be "a lot easier" if she did so. During multiple

meetings he told her that she should "learn the game."

44. Beginning in July 2016, Orestes Solis – the dedicated research staff scientist and

lab manager hired by Dr. Mehta to perform work in her laboratory as part of the institutional

support Smoller had promised the NIH – was commandeered by the Pathology Department to

routinely perform clinical autopsy work due to shortages in coverage.  As a result, a significant

portion of Solis's time was taken away from Dr. Mehta's NIH-funded research in violation of

Smoller's July 7, 2015 written commitment to the NIH that URMC would provide funding for

Dr. Mehta to "hire a dedicated technician."  Despite Dr. Mehta's repeated and continued

objections, this practice continued throughout the time that she worked in the Pathology

Department and violated the terms of the certifications URMC was required to make to the NIH

in order to receive her K08 grant funds.

45. At a meeting and in a subsequent email on July 8, 2016, Smoller informed Dr.

Mehta that he had unilaterally decided to explore with Jeffrey Lyness, URMC's Senior Associate

Dean for Academic Affairs, the concept of revising her job description to become a full-time

researcher together with substantially lowering her salary.  Smoller's email refused to

acknowledge the NIH-imposed obligation and instead disingenuously implied that Dr. Mehta's

concerns instead constituted a disagreement over what was a reasonable workload: "I truly regret that you and I have such discrepant views of what constitutes a reasonable service load ... [but] I must ensure reasonable service loads for every member of this group."

46.     On July 13, 2016, Dr. Mehta emailed Lyness, forwarding Smoller's July 8 email and requesting to speak with him confidentially.  At a subsequent July 22 meeting with Lyness, Dr. Mehta described the workload she was being forced to perform in violation of the terms of her K08 grant and the threatening letter Smoller had sent her in March after her complaints regarding the failure to respect the NIH-mandated protected time.  She also told Lyness about Smoller's "suck it" comment to which Lyness responded by laughing and then moving the conversation in another direction.

47.     Over the course of the summer of 2016 a series of discussions and meetings ensued in which Smoller and Lyness continued to discuss "restructuring" Dr. Mehta's contract to lower her salary in return for eliminating all of her clinical duties.  Ultimately, however, they claimed to be unable to obtain approval for this because it would exacerbate the staffing problems of the Pathology Department in meeting its clinical obligations.  Lyness also made clear to Dr. Mehta that he had no intention of intervening or forcing Smoller to rectify the violation of her NIH-mandated protected research time.

48.     In September 2016, Dr. Mehta's clinical workload was further increased when the Neuropathology Division head, Mahlon Johnson, increased her workload with Boyce's agreement.  Over the course of the next eight months, she was required by Smoller and his departmental leadership team to perform clinical services for both divisions that frequently left her no protected research time for weeks or months on end and on average required between 50% and 75% of her professional time.

16

49.     In February 10, 2017, Dr. Mehta sent an email to Richard Burack, the newly-
appointed Vice Chair for Operations of the Pathology Department.  In her email she informed
Burack that her dedicated research scientist (Solis) had been improperly required to spend
significant time assisting with autopsies and that this was "hindering [her] research progress."
She requested that Burack assist in finding alternative technical support so Solis could be freed
to perform his research functions.   She also complained to Burack regarding her clinical
schedule and informed him of Smoller's commitment at the time she was hired:

> While Dr. Smoller has committed to my being on service one week
> per month with contemporaneous autopsy and NP service work,
> this has not been the case and my scheduled workload continues to
> spill over into 2-3 weeks of the month.  With the necessary follow-
> ups for autopsies and NP surgical reports, the clinical work
> continues to fall on 3-4 weeks of the month, which is further
> significantly hindering my research progress.

50.     However, despite follow-up meetings with Burack, no changes were made to Dr.
Mehta's clinical workload.

51.     During the initial months of 2017 Smoller resisted Dr. Mehta's efforts to meet
personally with her.  Finally, however, on May 12, 2017, he met alone with Dr. Mehta in his
office for her annual performance review.  Dr. Mehta again sought Smoller's help to address her
clinical workload and many of the mismanagement and scheduling issues resulting in her NIH-
required research time not being protected.  Smoller initially expressed sympathy but then cut
her off and began criticizing her research progress and failure to "fix" the multitude of
departmental problems which he acknowledges existed but bizarrely claimed were not his
problems.  He disparaged, bullied and belittled Dr. Mehta and at times hovered over her and at
other times paced the room.  He then repeated his misogynistic conduct from the previous year
by leaning back in his chair, thrusting his crotch towards Dr. Mehta and telling her in a menacing

tone to "suck it."  At that point Dr. Mehta abruptly left Smoller's office, feeling degraded and

humiliated.  Notably, earlier in the meeting Smoller told Dr. Mehta that the way she was being

treated at URMC was not any different from the way she would be treated "as an Asian woman"

elsewhere in academia.

52.    Later that day, apparently concerned about the inappropriateness of his action and

what Dr. Mehta might do about them, Smoller wrote Dr. Mehta an apologetic email in which he

stated:

> Any chance we might reschedule a continued meeting?  I didn't
> feel like we came to a very satisfying resolution, and I don't think
> you did either.  Can we see if we can regroup and try to come up
> with something that might work for you?  Thank you for
> considering.  Bruce.

53.    A week later, on May 19, 2017, Smoller again met with Dr. Mehta to discuss how

her schedule could be changed to try to accommodate more protected research time.  Several

hours after the meeting he emailed her and proposed a clinical workload that would reduce her

non-research time to a more manageable level – albeit still far in excess of the NIH-mandated

25% – and confirmed that her clinical duties would be confined to the neuropathology division

(including autopsy work performed by the division).   His email also implicitly conceded that the

schedule he was proposing still did not comply with her 75% NIH-mandated protected time or

the commitments he had made to her during the hiring process and was instead a compromise

based on his department's needs "and what [the heads of the Neuropathology and Autopsy

Divisions] will require in order to preserve their own careers and services."

54.    Unbeknownst to Dr. Mehta at the time, on or after implementing her clinical

schedule change Smoller filed her annual written review in the URMC performance management

system.  In his written comments he was highly critical of Dr. Mehta for repeatedly pushing for

her research time to be protected, at one point quoting one of the division directors being "frustrated by [Dr. Mehta's] basic complaint that her clinical responsibilities are more than 25%." The review also contained a host of other baseless criticisms of Dr. Mehta for her "communication style" and other issues but notably Smoller admitted in her review that her publication record was "terrific" and that for anyone else he would be "thrilled with the productivity for a single year."

55.     It soon became apparent that Smoller had no intention of enforcing Dr. Mehta's new schedule within the department and he quickly permitted the Neuropathology Division director (Johnson) to repeatedly increase Dr. Mehta's workload and schedule to accommodate Johnson's personal and other professional needs. As the only other faculty member providing clinical services for the division Dr. Mehta had to absorb any work Johnson was unable or unwilling to perform.

56.     In July 2017 Smoller emailed Dr. Mehta making it clear he would not support her promotion and falsely mischaracterizing the events that had transpired and her accomplishments in various ways. The email was designed to create the false impression that Smoller was trying to educate Dr. Mehta on what would be required for promotion but was instead a transparent attempt to warn her that he would not support a promotion. This was directly contrary to his representations to Dr. Mehta before being hired that he would support her promotion within her first year at URMC based on her previous accomplishments and continuing research and was a further blatant act of retaliation against Dr. Mehta as a result of the stance she had taken in attempting to force him to comply with the NIH grant conditions.

**G.**   **Dr. Mehta's Escalation of Her Complaints About NIH Grant Violation and Smoller's Escalation of His Retaliation Culminating in His Decision Not to Renew her Contract**

57.   On October 13 and 14, 2017, Dr. Mehta attended a Symposium in San Diego held by the National Institute of Neurological Disorders and Stroke ("NINDS"), the Institute within the NIH that awarded her K08 grant.  While at the symposium Dr. Mehta met with Dr. Stephen Korn, Director of NINDS' Office of Training & Workforce Development and discussed her difficulties at URMC and Smoller's refusal to respect the NIH's protected research requirement. Dr. Mehta also informed Korn that Solis (the dedicated research scientist hired by her using her research funds) was being required to spend significant amounts of his time performing work for the Autopsy division that was unrelated to her NIH-funded research.  Korn was shocked and angered by her description of these issues and told her bluntly that her department was violating the terms of her NIH grant and that its conduct constituted blatant fraud.  He also advised her that URMC should provide her with a two-year extension paid for by her department to complete her research.

58.   In a subsequent email exchange with Korn on October 17, 2017, Korn confirmed the method by which her protected 75% research time should be calculated.  In his email Korn expressly stated that "[t]ime on call is not protected time for research."  This mirrored the language in the NIH's online guidance.  Korn also confirmed that "protected time" had to be protected: "'not being busy' does not constitute protected time for research.  Either time is uninterruptible (and therefore protected) or it isn't."

59.   Upon her return from the Symposium, Dr. Mehta discussed Korn's email and in-person comments with Gelbard and Sue Brightman (the administrator of CND) and sought their assistance in remedying the NIH violations.  They suggested she independently talk with

URMC's Senior Associate Dean for Inclusion and Culture Development, Linda Chaudron.

60.     Dr. Mehta also met with Smoller in early November and informed him of Korn's instructions.  Smoller reacted angrily and threateningly and challenged Dr. Mehta to "go tell the deans" if she had an issue.

61.     Shortly after Dr. Mehta returned from the Symposium, her departmental administrator began pressuring her to sign an internal university audit form entitled "NIH K Award Effort Certification" for the period January through June 2017.  The form stated that "[i]n accordance with the policies set forth by the [NIH] concerning the awarding and administrative oversight of Career Development Awards ... the University ... must certify that the candidate will be released from other duties and be able to devote <u>at least 75% effort</u> to the research program" (emphasis in original).  The form required both Dr. Mehta's signature and Smoller's signature and required that she certify that she was "in compliance with the 75% minimum effort requirement as set forth by the NIH K Award guidelines noted above."

62.     In light of Smoller's refusal to provide her with protected research time of anywhere near 75% and her recent conversations with Korn, Dr. Mehta added a notation above her signature on the form that read "According to NIH guidelines I am not receiving 75% protected time."  She signed the form on November 4, 2017 and it was collected by the departmental administrator on November 11, 2017.  The administrator immediately emailed Dr. Mehta objecting to her handwritten statement and she informed him that she had discussed it with Smoller.

63.     On November 20, 2017, Dr. Mehta met with URMC's Snr. Associate Dean for Inclusion and Culture Development, Linda Chaudron.  She informed Chaudron that her research time has not been protected by her department as is required for URMC's receipt of her NIH

grant funds and that the NIH's Director of Training & Workforce Development had instructed

that she should be given a two-year extension paid for by her department to complete her

research and that he had characterized her department's refusal to provide her with protected

research time as "fraud."  She sought Chaudron's assistance to accomplish this but Chaudron

was non-responsive to Dr. Mehta's request.

64.     On November 17, 2017, Dr. Mehta emailed Smoller about a required letter of

support she needed to apply for a Doris Duke CSDA grant of $500,000 which Smoller had

previously agreed to support in multiple conversations.  Two minutes later Smoller wrote back

stating he would not sign it because "the department cannot agree with your definition of time

accounting" – a blatant reference to the disclaimer Dr. Mehta wrote on the internal compliance

certification provided to the administrator a week earlier.

65.     On November 19, 2017, Dr. Mehta emailed Stephen Dewhurst, URMC's Vice

Dean for Research, reporting Smoller's latest act of retaliation and requesting a meeting.

Dewhurst never responded.

66.     Smoller bluntly told Dr. Mehta that he would not sign off on any new grant

applications for her if she did not withdraw her disclaimer on the University audit form and sign

a new version of the form without any notation in order to "maintain compliance" for the

department.  Believing she had no alternative if she wanted to remain employed, Dr. Mehta

complied on November 28, 2017 and provided a copy to the department's administrator.

67.     On the morning of November 29, 2017, Dr. Mehta emailed Smoller informing

him that "[p]er your request, the signed NIH form [i.e., the university audit form without the

disclaimer] was submitted to Ricky yesterday" and reminding him that the Doris Duke grant

application was due two days later.  That same afternoon Smoller submitted the required letter of

institutional support for her Doris Duke grant application and forwarded Dr. Mehta a
confirmation email.

68.     Following the latest acts of bullying and retaliation by Smoller, Dr. Mehta began
escalating her complaints to senior members of the University administration.  On November 29,
2017, Dr. Mehta met with Vivian Lewis, URMC's Vice Provost for Faculty Development &
Diversity.  During that meeting Dr. Mehta reported to Lewis the departmental understaffing and
the threats, retaliation, harassment and fraud to which she had been subjected by Smoller,
including his ongoing refusal to provide the protected research time mandated by the NIH grant
and the efforts she had undertaken to push back on this.  She also explained that some of the
problems stemmed from the transfer of her grant to CND and the resulting motivation for
Smoller to obtain more clinical time from her than was permitted and asked that her grant to be
transferred back to her primary department.  Lewis told her that it was "none of her business"
where her grant went and was not her decision to make.  Dr. Mehta then asked Lewis that she be
permitted to transfer out of the Pathology department and be provided with an extension of her
appointment as suggested by Dr. Korn of the NIH.  Lewis listened to her concerns but did not
offer an help, solutions or paths forward.

69.     On December 12, 2017 Dr. Mehta met with Janine Shapiro, URMC's Associate
Dean for Faculty Development.  Dr. Mehta arranged the meeting based on advice she had
received from Dr. Shawn Newlands, Chair of URMC's ENT department, who was very
sympathetic to Dr. Mehta's struggles to obtain her protected research time and suggested that
Shapiro may be able to help with "the disconnect" between what Dr. Mehta needed from the
department and "what she was being provided."

70.     During the December 12 meeting, Dr. Mehta described to Shapiro the under-

staffing and administrative problems within the Pathology department, Smoller's ongoing refusal to provide Dr. Mehta the protected research time mandated by her NIH grant terms and the efforts Dr. Mehta had undertaken to push back on this.  Shapiro acknowledged that she knew about these problems within the department, including significant workflow and software problems causing frequent backlogs as well as the multiple "difficult personalities" at the top within the department.  Dr. Mehta stated that she wanted her grant moved back into her department or otherwise wanted to be moved out of the Pathology department into another department that housed her grant, but Shapiro told Dr. Mehta that the department needed her help and that its needs "are what they are."  She also acknowledged that Dr. Mehta's department was not honoring the protected research time required by the NIH, told her to "keep pushing" and informed Dr. Mehta that "you will have to work harder because you are a woman." However, she warned Dr. Mehta that Smoller was well-liked and was "not going to be going anywhere" so Dr. Mehta would have to "get used to it" and find a way to deal with him.  Once again, Shapiro offered no solutions and no further assistance.

71.    Over the course of the next several months the department's clinical demands on Dr. Mehta's time continued unabated.  On March 26, 2018, Dr. Mehta therefore met again with Senior Associate Dean Linda Chaudron (with whom she had met the previous November).  Dr. Mehta reiterated to Chaudron that her research time was still not being protected as required by the NIH and again described some of many departmental problems that contributed to her improper clinical workload. Dr. Mehta also reiterated the direction she had received from Korn that URMC should financially support an extension of her NIH research at no cost to the NIH. Chaudron indicated that she would speak directly with Smoller about the situation and told Dr. Mehta she wanted to try to help her find a path forward with her research.

24

72.     During the meeting Chaudron also acknowledged the huge challenges that existed in academia regarding the "power dynamics" between younger women and their supervisors. At that point Dr. Mehta proceeded to tell Chaudron about some of Smoller's more abusive conduct toward her during their private meetings, including specifically his repeated comments and gesture in which he told her to "suck it."  Chaudron responded by acknowledging her awareness that several women in the Pathology Department had previously had "issues" with Smoller and the department.  Dr. Mehta responded by telling Chaudron that many women in the Pathology department had been harassed and resigned both before and after her arrival at University of Rochester.

73.     The March 26, 2018 meeting concluded with Chaudron suggesting that she meet with Dr. Mehta and Smoller together to help her determine the ways in which she may be able to help.

74.     The following morning Dr. Mehta received a meeting request from Smoller.  She immediately forwarded it to Chaudron who confirmed later that day that she had spoken with Smoller and would attend the meeting too.

75.     On April 3, 2018, Dr. Mehta attended a meeting in Smoller's office with Smoller and Chaudron.  As the meeting began, Smoller immediately handed Dr. Mehta a letter of non-renewal of her faculty appointment which at that time had an additional 15 months left on its current term.  The letter stated that her employment would therefore end on June 30, 2019. Chaudron reacted to the letter as if she were surprised although Dr. Mehta suspected she had been told by Smoller in advance of what he was planning to do.

76.     During the meeting Smoller initially leveled false criticisms of Dr. Mehta's performance of her clinical duties and falsely claimed that other staff had complained about her –

apparently as a pretext for his decision not to renew her appointment.  However, when Dr. Mehta
disputed these accusations -- including with written emails she brought to the meeting in which
Smoller acknowledged being misinformed and retracted his blame of Dr. Mehta -- Smoller
backed down and admitted that she had not been treated fairly.  Chaudron told Dr. Mehta during
the meeting that the department's current "needs" at that time were different than Dr. Mehta's
"needs" as a researcher and that, because of the pressing departmental needs, the department
could not support her.  Chaudron also bluntly informed Dr. Mehta that Smoller was in charge as
Chair of the Pathology department and that "what he says is what goes."

77.     The reason Smoller decided not to renew Dr. Mehta's appointment and term of
employment was because of her escalating complaints and efforts to force him to abide by
URMC's NIH-mandated requirements to provide her with a minimum of 75% protected research
time as a condition for receiving the NIH grant funds.  Indeed, in keeping with the requirement
of URMC's Regulations of the Faculty, Smoller's non-renewal letter was required to provide the
"basis for [his] decision" and Smoller's letter candidly provided the basis for his decision: "As
you know, you and we have had a difference of perspectives regarding what constitutes a
reasonable workload for the 25% service time we agreed to."

78.     Over the next few days Dr. Mehta discussed Smoller's non-renewal letter with
Johnson (the Neuropathology Division head for whom she performed her clinical duties at that
time).  Johnson appeared genuinely surprised and told her he was "shocked" at the decision and
was not consulted in advance of Smoller making the decision.  His comments also indicated that
it was highly unusual for Smoller to make such an important decision regarding the department
and a faculty member's future without consulting other senior departmental leaders.

**H.**   **Smoller's Continuing Retaliation Against Dr. Mehta and his Eventual Ouster of her From the Pathology Department**

79.     As with  all hospital networks, URMC is required to perform an Ongoing Professional Practice Evaluation ("OPPE") process for its physicians annually as part of its hospital accreditation process.

80.     Beginning in the summer of 2018, Smoller attempted to obtain Dr. Mehta's signature on new OPPE forms, including for a period prior to his decision not to reappoint her to her faculty position and for which Dr. Mehta had previously completed the forms.  Dr. Mehta first discovered these forms in her Pathology Department mailbox on August 9, 2018.

81.     One form purported to be for the calendar year 2017, notwithstanding that Dr. Mehta had previously completed a form for that period.  The second form was for the first six months of 2018.  Both forms falsely purported to document clinical errors by Dr. Mehta that she had not made.  They also both indicated that she had been the subject of "documented complaints and/or disruptive events" but left blank the box on the form in which details were to be provided.  Moreover, the boxes containing the certification as to whether Dr. Mehta was "competent to perform [her] assigned duties" was also left blank.

82.     When Dr. Mehta discussed the forms with other faculty members they warned her that the forms she was being asked to complete were highly irregular and inappropriate.  Dr. David Hicks -- a highly respected and internationally renowned tenured professor in the Pathology Department warned Dr. Mehta that he thought the request was "unethical" and "very fishy" and recommended to her that she not sign the forms.

83.     Pathology Department administrators continued to press Dr. Mehta to sign the forms but she declined.  Finally, in an email dated October 22, 2018, Smoller informed Dr. Mehta that he was removing her from clinical duties because of her failure to sign the OPPE

forms and that as a result she would be required to vacate her Pathology Department office, notwithstanding that her official faculty appointment in the department had eight months left to run.

84.     Shortly thereafter, Smoller removed her name from the departmental website thereby removing all public record of her association with the department.  Smoller's premature ouster of Dr. Mehta from the department left her without a departmental "home" at URMC and had damaging effects on her reputation and access to critical resources required for her continuing NIH-funded research.

85.     Smoller's attempt to obtain Dr. Mehta's signature on the falsely-completed OPPE forms and his subsequent premature ouster of her from the Pathology Department were undertaken in furtherance of his campaign of retaliation against Dr. Mehta.

86.     Smoller's campaign of retaliation against Dr. Mehta continued in early 2019 when he took actions to block her from being considered for another faculty position in the Department of Neuroscience which would have enabled her to continue in a funded faculty position and remain at URMC.

87.     As a result of an informal collaboration with Dr. Maiken Nedergaard, a leading physician research scientist at the URMC's Center for Translational Neuromedicine ("CTN"), Dr. Mehta had an opportunity to remain at URMC in a tenure-track faculty position in URMC's Neuroscience Department and continue her NIH-funded research.  In March 2019, Nedergaard and Halterman nominated Dr. Mehta for a new tenure-track faculty position announced by URMC's Neuroscience Department for an Alzheimer's disease researcher.  Nedergaard wrote in support of Dr. Mehta's application to John Foxe and Kerry O'Bannion (Chair and Vice Chair respectively of the Neuroscience Department) who headed the Alzheimer initiative and requested

that Dr. Mehta be considered for the positon.  Nedergaard also offered to support Dr. Mehta in developing an NIH R01 grant application to support her research.

88.     Dr. Mehta met with O'Banion on April 9 2019, at which point O'Banion was enthusiastic about Dr. Mehta's candidacy.  Subsequent to that meeting, however, O'Banion informed Nedergaard that Foxe had met with Smoller and was told by Smoller that Dr. Mehta was "hopeless" and should not be hired.  Upon information and belief, Smoller's actions prevented Dr. Mehta from obtaining the position and was another blatant act of retaliation by Smoller.

I.     **The Severe Damage Inflicted on Dr. Mehta's Career as a Direct Consequence of Smoller's Retaliation**

89.     As a direct result of Dr. Mehta being forced to spend 50% to 75% of her professional time performing non-research work for the Department of Pathology, she was unable to complete her NIH-funded research prior to the expiration of the term of her NIH grant. It also prevented Dr. Mehta from applying for and obtaining any R01 NIH research grants which are required for her to advance her career as an academic physician research scientist and greatly hampered her ability to obtain a new academic appointment outside URMC at the expiration of her four-year appointment which ended on June 30, 2019.

90.     As a result of her informal collaboration with Nedergaard, Dr. Mehta was able to secure a laboratory workbench at CTN and continue her research following the end of her Assistant Professor appointment.  However, her position at the CTN was a non-tenure-track Visiting Assistant Professor appointment and the arrangement precluded her from having an independent research laboratory at URMC.

91.     Moreover, although Dr. Mehta was able to secure a twelve-month "no-cost" extension of her grant from the NIH, URMC only nominally supported and partly financed a six

month interval of her faculty appointment during the extension period until the end of 2019. This prevented her from having any dedicated technician support and forced her to accept a salary that was barely more than half of the salary she received as an Assistant Professor in the Department of Pathology.  URMC's lack of support during her no-cost extension forced her to return approximately $26,000 from her K08 grant to the NIH.

92.     At the end of 2019, Dr. Mehta was able to secure a research faculty position at Rush University in Chicago as an Assistant Professor in its Department of Pathology and the Rush Alzheimer's Disease Center.  However, she continued to lack an independent laboratory and has been required to divide her time between URMC and Rush University in order to continue her research.  Furthermore, she is unable to practice as a clinical pathologist in this new position.

93.      Smoller's decision to oust Dr. Mehta from the Pathology Department in retaliation for her continued efforts to force him to abide by the terms of her NIH grant, and his subsequent actions to block her from any new faculty positions at URMC, has substantially damaged her career.  She now must begin her tenure track anew at a new medical school with the resulting delay of multiple years in obtaining a tenured academic appointment.

## **FIRST CAUSE OF ACTION**

### (Retaliation Claim Pursuant to False Claims Act)

94.     Pursuant to Fed. R. Civ. P. 10(c), Dr. Mehta repeats and realleges each and every allegation contained in paragraphs "1" through "92" as if repeated and incorporated herein.

95.     Upon information and belief, URMC repeatedly made false certifications to the NIH regarding its compliance with the core term of Dr. Mehta' K08 grant that 75% of her professional time be protected for her research.

96.     Upon information and belief, the NIH disbursed federal research funds to URMC in reliance upon the foregoing false certifications and would not have disbursed the funds in the absence of said certifications.

97.     Smoller made his decision not to renew and/or recommend renewal of Dr. Mehta's appointment as an Assistant Professor in the Department of Pathology because of her efforts to prevent URMC's violations of 31 U.S.C. § 3729.

98.     Smoller undertook the other acts of retaliation set forth herein because of Dr. Mehta's efforts to prevent URMC's violations of 31 U.S.C. § 3729.

99.     As a result thereof, Dr. Mehta is entitled to: (a) reinstatement with the same seniority status that she would have had but for the retaliation and/or front pay damages; (b) two times the amount of her back pay damages together with interest thereon; (c) compensation for special damages sustained as a result of the retaliation, including but not limited to career damages and emotional distress damages she has sustained; and (d) litigation costs and reasonable attorneys' fees she has expended.

## SECOND CAUSE OF ACTION

(Retaliation Claim Pursuant to N.Y. Executive Law § 296)

100.    Pursuant to Fed. R. Civ. P. 10(c), Dr. Mehta repeats and realleges each and every allegation contained in paragraphs "1" through "92" as if repeated and incorporated herein.

101.    Smoller made his decision not to renew and/or recommend renewal of Dr. Mehta's appointment as an Assistant Professor in the Department of Pathology because she opposed practices forbidden under N.Y. Exec. Law § 296.

102.    Smoller undertook the other acts of retaliation against Dr. Mehta set forth herein because she opposed practices forbidden under N.Y. Exec. Law § 296.

103.    By reason of the foregoing, Defendant has violated New York Executive Law § 296, thereby causing damages to Dr. Mehta in an amount to be determined at trial.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)    On her first cause of action, awarding her: (a) reinstatement with the same seniority status that she would have had but for the retaliation and/or front pay damages in an amount to be determined at trial; (b) two times the amount of her back pay damages in an amount to be determined at trial together with interest thereon; (c) compensation for special damages sustained as a result of the retaliation in an amount to be determined at trial, including but not limited to career damages and emotional distress damages she has sustained; and (d) litigation costs and reasonable attorneys' fees she has expended.

(ii)    On her second cause of action, awarding her compensatory, emotional distress and punitive damages in an amount to be determined at trial together with her litigation cost and attorneys' fees; and

(iii)    For such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated: New York, New York
April 5, 2021

KAISER SAURBORN & MAIR, P.C.
Attorneys for plaintiff

By:    _____
        David N. Mair
        30 Broad Street, 37th Floor
        New York, New York 10004
        (212) 338-9100