UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RUPAL MEHTA, M.D.,

                                  Plaintiff,

                                                                                               Case # 21-CV-6299-FPG

v.

                                                                                           DECISION AND ORDER

UNIVERSITY OF ROCHESTER MEDICAL CENTER,

                                  Defendant.
_____

## INTRODUCTION

Plaintiff Rupal Mehta brings this action against her former employer, University of Rochester Medical Center ("URMC"). ECF No. 1. She alleges that she suffered retaliation when she opposed URMC officials' efforts to compel her to violate the conditions of a federal grant, and when she complained about gender discrimination. With respect to the former, Mehta asserts a claim under the antiretaliation provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and with respect to the latter, she raises a claim under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. URMC now moves for summary judgment on both claims. ECF No. 45. For the reasons that follow, URMC's motion for summary judgment is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding

1

whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND

The summary-judgment record is extensive, and the parties proffer highly divergent versions of the underlying events. Given the standard of review, however, the Court will confine its discussion to the facts proffered by Mehta and taken in the light most favorable to her. In accordance with its limited role on summary judgment, the Court takes no view about the credibility of Mehta's version of events.

Mehta is a licensed and board-certified pathologist. *See* ECF No. 51-2 at 1. In 2011, she joined the faculty at the University of Maryland School of Medicine. *See* ECF No. 51-71 at 4. In 2014, Mehta received a "K08 career development research grant" from the National Institute of Neurological Disorders and Stroke ("NINDS")—an institute housed within the National Institutes of Health ("NIH"). ECF No. 51-2 at 2. NIH is a federal agency.

The "K08" grant provides support so that research scientists can engage in a "sustained period of 'protected time' (generally three, four, or five years) for intensive research career development under the guidance of an experienced mentor or sponsor in the biomedical, behavioral, or clinical sciences." ECF No. 45-16 at 5. A "K08" grantee must devote "a minimum commitment equivalent of 9 calendar person months (75% [of] their full-time appointment at the applicant institution) to the career development and research objectives of the program," with the "remaining 3 person months (25% effort), if applicable, [] divided among other research, clinical,

and teaching activities," so long as those other activities are "consistent with the . . . [the grantee's] development into an independent investigator." *Id.* at 6. The K08 grant is conditioned on various reporting requirements, including the submission of progress reports. *See id.* at 7. Additionally, the institution hosting a K08 grantee must make certain commitments to ensure that the grant is used in accordance with its objectives and conditions. *See* ECF No. 51-64; ECF No. 51-72 at 4.

In July 2015, URMC hired Mehta as an assistant professor in its Department of Pathology and Laboratory Medicine, for a four-year appointment to end June 30, 2019. *See* ECF No. 45-2 ¶ 1. Bruce Smoller—the chair of URMC's Pathology Department—submitted a letter to NIH affirming that URMC would honor the requirement that Mehta have "75% protected time for her research activities and career development." ECF No. 51-22 at 2 (emphasis omitted). NIH transferred Mehta's award to URMC in September 2015. *See* ECF No. 45-18 at 2. At that time, URMC began receiving Mehta's grant funds from NIH, and it would ultimately receive over $600,000 in grants during the term of Mehta's appointment. *Id.* at 34.

Mehta asserts, and the Court must accept at this juncture, that during late 2015 and early 2016, Smoller and Brendan Boyce—vice chair of the Pathology Department—insisted that Mehta perform "clinical work that required vastly more than 25%" of her working time due to "under-staffing and other workflow problems in the autopsy division." ECF No. 51-2 at 3; *see also id.* at 7-10; ECF No. 51-27 at 2 (January 2016 email from Mehta to Boyce and Smoller) (calculating that her clinical duties "comprised 35-40% of total month work hours"). Mehta repeatedly complained that the clinical obligations imposed on her were inconsistent with the conditions of her K08 grant. *See* ECF No. 51-27; ECF No. 51-29; ECF No. 51-30. Smoller became irate at Mehta's complaints, *see* ECF No. 51-28 at 2, and in a letter dated March 9, 2016, impliedly threatened her continued professional progress at URMC should she maintain her objections to the

current arrangement. *See* ECF No. 51-32 at 2-4 (asserting that Mehta's "time at URMC is not off to a good and productive start"; that the "trajectory" needs to be "alter[ed]"; criticizing Mehta's "niggling about exact times spent in one endeavor or another"; and alluding to the need to "turnaround the current momentum" of Mehta's employment so that she can have a "long and productive career" at URMC).

As time went on, Mehta continued to request assistance from various URMC officials to alter her duties to conform to the grant requirements, to no avail. Several acknowledged that Mehta's workload was inconsistent with her grant requirements, but believed the violations were necessary given the Pathology Department's needs. *See* ECF No. 51-2 at 10-11, 12. There is evidence that Smoller was aggressive and intimidating to Mehta due to her complaints. At a meeting in early summer 2016, when Mehta again lobbied Smoller for relief from her extensive clinical work, Smoller "leaned back in his chair, thrust his crotch toward [Mehta] and told [her] to 'suck it.'" ECF No. 51-2 at 10. Smoller soon suggested to Mehta that he was considering demoting her to a "full-time researcher" and reducing her salary accordingly. ECF No. 51-35 at 2. At another meeting, Smoller repeated his "suck it" insult and gesture, while telling Mehta that her treatment "was not any different from the way [she] would be treated 'as an Asian woman' elsewhere in academia." ECF No. 51-2 at 13.

Mehta's struggle to induce URMC to abide by the grant requirements continued. In fall 2017, Mehta received confirmation from an NIH official that the responsibilities placed upon her did not conform to K08 grant requirements. *See* ECF No. 51-44. Believing that URMC was "committing fraud against the government" by accepting the grant money while refusing to provide "75% protected time for research," Mehta had a meeting with Smoller. ECF No. 51-2 at 17. Smoller "reacted angrily" to this information and "challenged [Mehta] to 'go tell the deans' if

4

[she] had an issue." *Id.* Shortly thereafter, a URMC grants administrator requested that Mehta complete a routine "NIH K Award Effort Certification." ECF No. 45-20 at 4. This certification would confirm that Mehta's work responsibilities conformed to the conditions of the K08 grant. Initially, Mehta executed the certification with a notation that "according to NIH guidelines, I am not receiving 75% protected time." *Id.*

Smoller took two actions after Mehta submitted the certification. First, on November 14, 2017, Smoller drafted a letter to Mehta informing her that her employment would not be renewed at the completion of her term. *See* ECF No. 51-67 at 2. Smoller wrote in relevant part:

> While there is no explicit requirement that the Chair [of the department] provide justification or explanation for the decision, it may be helpful for you to understand the reasoning behind this decision. As you know, the Department Chair, its Division directors and you have not ever been able to come to terms on what constitutes a reasonable workload for the 25% service time that we agreed to. The department has a real need for coverage on the autopsy and neuropathology service that is in excess of what you are willing and able to provide. For this reason, the Department has decided to give you notice of its intention in advance of the time legally required.

ECF No. 51-67 at 2. Smoller saved this document but did not send it to Mehta.

Second, Smoller confronted Mehta about her notation, threatening to reject "any new grant applications for [her] if [she] did not withdraw" the notation on the certification form. ECF No. 51-2 at 18. At Smoller's insistence, Mehta executed a new certification without the notation. *See* ECF No. 45-20 at 5. The day after Mehta submitted the new certification, Smoller completed a letter of institutional support on Mehta's behalf for an unrelated grant application. Unbeknownst to Mehta, however, Smoller included information in the letter that painted Mehta as an unattractive candidate. ECF No. 51-2 at 19. Mehta was not awarded the grant.

It was not until several months later, on April 3, 2018, that Smoller informed Mehta of the nonrenewal of her appointment. ECF No. 51-56 at 2. At his deposition, Smoller could offer no

5

explanation for the delay, *see* ECF No. 51-7 at 18, but the timing coincides with a meeting that Mehta recently had with Linda Chaudron—URMC's associate dean for Inclusion and Culture Development. Just a few days earlier, Mehta had met with Chaudron to complain that her research time "was still not being protected as required by the NIH," and Mehta "described some of the many departmental problems that contributed to [her] improper clinical workload." ECF No. 52-1 at 20. Mehta further notified Chaudron about Smoller's "abusive conduct toward [her] during [their] private meetings, including his comments and gesture in which he told [her] to 'suck it' and that many other women in the Pathology department had been harassed and resigned both before and after [her] arrival at [URMC]." *Id.* When Smoller met with Mehta to apprise her of her nonrenewal, Chaudron was present. *See* ECF No. 51-1 ¶ 198.

After the completion of her appointment, in April 2021, Mehta brought this action. She raises two claims against URMC: (1) retaliation in violation of 31 U.S.C. § 3730(h), and (2) retaliation for her complaints of discrimination in violation of the NYSHRL. ECF No. 1 at 30-32.

## DISCUSSION

URMC moves for summary judgment on both of Mehta's claims. As discussed below, the Court concludes that none of URMC's arguments justifies summary judgment on Mehta's claims.

### I. Retaliation under the FCA

The FCA "protects an employee's 'lawful acts done ... in furtherance of ... efforts to stop 1 or more violations of' the FCA." *Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) (quoting 31 U.S.C. § 3730(h)(1)). This provision protects employees who "actually file a qui tam action," as well as those who "blow the whistle internally or externally without the filing of a qui tam action, or who refuse to participate in the wrongdoing." *Id.* Courts generally apply the *McDonnell Douglas* framework to Section 3730(h) claims, under which "(1)

6

the employee bears the initial burden of producing evidence sufficient to support a *prima facie* case of retaliation; (2) the burden shifts to the employer to articulate a legitimate, non-[retaliatory] reason for its actions; and (3) the burden shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation." *Plotzker v. Kips Bay Endoscopy Ctr., LLC*, No. 12-CV-9255, 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017). To substantiate a *prima facie* case of retaliation, the plaintiff must produce sufficient evidence that "(1) [she] engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [her] because [she] engaged in the protected activity." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017). URMC only disputes the sufficiency of the evidence with respect to the first two elements. ECF No. 49 at 22-34.

The Court concludes Mehta has proffered sufficient evidence on the first element, protected activity. Neither side disputes the general proposition that a false certification of compliance to the NIH for the purpose of inducing further payment of grant monies would constitute a FCA violation. *Cf.* 31 U.S.C. § 3729(a)(1)(A)-(B); *Singletary v. Howard Univ.*, 939 F.3d 287, 298 (D.C. Cir. 2019). There is sufficient record evidence of such a violation: URMC officials submitted to NIH their compliance with the K08 grant's "75% protected-time" requirement, despite the fact that such certifications were false, and URMC officials knew they were false. *See, e.g.*, ECF No. 45-20; ECF No. 51-2. A reasonable factfinder could conclude that Mehta made "efforts" to stop these violations, within the meaning of Section 3730(h), by lobbying her supervisors to comply with the requirements, *see, e.g., Shi v. Moog Inc.*, No. 19-CV-339, 2019 WL 4543129, at *7 (W.D.N.Y. Sept. 19, 2019), lodging complaints with URMC officials about the noncompliance with grant requirements, *see Liss v. Heritage Health & Housing, Inc.*, No. 19-CV-4797, 2023 WL

7

2267366, at *6 (S.D.N.Y. Feb. 28, 2023) (collecting cases and stating that "an employee engages in protected FCA conduct when the employee makes complaints about the organization's suspected misuse of government funds"), and refusing to falsely certify URMC's compliance in Fall 2017, *cf. Chorches*, 865 F.3d at 96 (refusal to falsify certify form for Medicare reimbursement constituted protected activity). In short, Mehta has presented sufficient evidence of protected activity.

URMC's contrary arguments are unpersuasive. URMC's contention that Mehta's complaints were "personally motivated" insofar as they were tied to "the terms of her employment" is immaterial. ECF No. 49 at 30. Obviously, there was an inextricable connection between K08 grant requirements and Plaintiff's working conditions, but that is simply because the grant *expressly regulated* the terms of Mehta's employment. An activity to thwart a FCA violation may be protected even if it also relates to an employee's personal working conditions. *See, e.g.*, *Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *2 (2d Cir. Jan. 17, 2024) (summary order) (employee's complaints to supervisors about the quality of patient care constituted protected activity since such complaints were also suggestive of fraudulent billing).

Similarly immaterial is URMC's observation that Mehta herself repeatedly affirmed her compliance with the K08 grant requirements. *See* ECF No. 49 at 26. An employee's otherwise protected activity is not rendered unprotected merely because the employee participated in, or acquiesced to, an employer's other FCA violations. *See Chorches*, 865 F.3d at 97-98 (employee's refusal to falsify document constituted protected activity notwithstanding employee's admission that he "falsified numerous [other documents]" for his employer). In other words, an employee's "efforts to stop *even a single violation of the FCA*" is protected. *Id.* (emphasis added). Thus, while

8

such facts may bear on the credibility of many of Mehta's claims and allegations, Mehta's protected activities are not rendered unprotected as a matter of law on that ground.

Finally, URMC marshals a variety of evidence to challenge the credibility of Mehta's claims. *See, e.g.*, ECF No. 49 at 26-27 (asserting that plaintiff's own certifications of compliance with grant requirements undermines her allegations of fraud); *id.* at 28-29 (claiming that NIH policies allowed for "a great deal of room for differing [protected-time] calculations" and thus URMC's failure to provide Mehta with "protected time according to *her* calculations was not a false certification"); *id.* at 30 (disputing Mehta's claim that she was compelled to sign the certification). Because these arguments rest on less favorable interpretations of the record evidence and/or adverse credibility inferences, they are not grounds for judgment as a matter of law. *See Dhaliwal*, 752 F. App'x at 101 (admonishing that a district court must "afford [the plaintiff] the benefit of all reasonable inferences . . . on a motion for summary judgment"); *SR Int'l Bus. Inc. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 118 (2d Cir. 2006) (noting that a court "may not make credibility determinations" at summary judgment).

Turning to the second element of a *prima facie* case, "[a] plaintiff must [] allege that [her] employer was aware that [she] was engaged in conduct that is protected by section 3730(h). The requisite standard for notice is flexible: the land of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." *United States v. Spectra Holdo, LLC*, No. 17-CV-2732, 2024 WL 457110, at *7 (E.D.N.Y. Feb. 6, 2024) (internal quotation marks and citation omitted). Contrary to URMC's argument, *see* ECF No. 49 at 32-33, there is sufficient record evidence that URMC officials were aware of Mehta's protected activity. Mehta avers that, during her tenure, she notified multiple URMC officials that her work was not in compliance with K08 grant requirements, including the chair of her department, the vice chair, the department

9

grants administrator, the associate dean for Inclusion and Culture Development, the vice provost for Faculty Development & Diversity, and the associate dean for Faculty Development. ECF No. 51-2 at 3-4, 17-20. Even if Mehta did not, in every instance, directly portray the noncompliance with the grant requirements as fraud against the government, a reasonable jury could conclude that URMC officials understood Mehta to be raising FCA-related concerns throughout this time given the obvious link between any noncompliance with grant requirements and the risk to ongoing government funding for Mehta's position. *Cf. Dhaliwal*, 752 F. App'x at 101 (employee gave sufficient notice of FCA-related concerns when she told her supervisor she wanted to raise issues about "improper marketing activity" to employer's "legal/compliance officer," despite the fact that she never expressly disclosed concern about potential fraud on the government). This is most clearly demonstrated by the fact that URMC's own "Research Compliance Officer" initiated an investigation into Mehta's complaints and expressed concern that Mehta had been in contact with an "NIH representative." ECF No. 51-51.

Accordingly, URMC's arguments concerning the *prima facie* case do not warrant summary judgment.

Next, URMC argues that summary judgment is warranted because it has proffered multiple non-retaliatory reasons for the nonrenewal of Mehta's appointment, which Mehta has not rebutted. *See* ECF No. 49 at 34-37. The Court disagrees. As stated above, if an employer is able to articulate "legitimate, non-[retaliatory] reason for its actions," the burden "shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation." *Plotzker*, 2017 WL 4326061, at *7. URMC argues that it did not renew Mehta's appointment because she could not complete the assigned workload, she had poor working relationships with other staff, she did not

fulfill certain job responsibilities, and she failed to secure additional grant funding. *See* ECF No. 49 at 34-36.

A reasonable jury could find these proffered reasons were, in fact, a pretext for retaliation. There is evidence that, in fall 2017, Smoller decided not to renew Mehta's appointment just days after she directly confronted him about the "fraud" occurring with respect to her grant requirements and refused to falsely certify compliance with the grant terms. *See* ECF No. 51-2 at 17; *see also Wentworth v. Hedson*, 493 F. Supp. 2d 559, 570 (E.D.N.Y. 2007) ("Timing alone may be sufficient to establish pretext."). Smoller reacted angrily to Mehta's actions, threatening to withhold institutional support until she withdrew her objections. *See* ECF No. 51-2 at 17-18. In his draft nonrenewal letter, the only basis that Smoller cited for nonrenewal was the dispute over "25% service time" and a need for "coverage on the autopsy and neuropathology service . . . in excess of what you are willing and able to provide." ECF No. 51-67 at 2. Several of the reasons for nonrenewal that URMC now raises—poor working relationships, an inability to fulfill other job responsibilities, and the failure to secure additional funding—are not mentioned in that letter. *See Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) (summary order) ("Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive."). Moreover, given Mehta's proffer that she was never allocated the 75% protected time to which she was entitled, *see, e.g.*, ECF No. 51-2 at 8-9, a reasonable jury could conclude that even Smoller's expressed reason for the nonrenewal was false and, therefore, pretextual, *see Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) ("A plaintiff may prove retaliation by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." (internal ellipses omitted)). This inference is bolstered by the evidence suggesting that Smoller waited several months to

11

inform Mehta of his nonrenewal decision, at which time he could rely on the results of a rubber-stamp investigation into Mehta's complaints to justify his actions and ward off any potential legal action. *See* ECF No. 51-1 at 39-43 (discussing URMC's investigation); ECF No. 51-36 at 3; ECF No. 51-57 at 2. Smoller himself has no explanation for that delay. *See* ECF No. 51-7 at 18.

Therefore, none of URMC's arguments warrants summary judgment.

## II. Retaliation under the NYSHRL

The NYSHRL "prohibit[s] retaliation against an individual who has opposed unlawful gender discrimination." *Miller v. Great Lakes Med. Imaging, LLC*, 527 F. Supp. 3d 492, 497 (W.D.N.Y. 2021). Mehta's theory is that she was terminated after raising complaints regarding Smoller's "sexist and misogynistic" conduct. ECF No. 51 at 39. Like Mehta's FCA claim, her NYSHRL retaliation claim is analyzed under the *McDonnell Douglas* framework. *See Felton v. M.C.C.*, No. 20-CV-6156, 2024 WL 4026195, at *10 (W.D.N.Y. Sept. 3, 2024).

In essence, URMC raises two arguments in support of summary judgment on this claim, both of which lack merit.

First, URMC appears to argue that, as a matter of law, the facts stated in Mehta's sworn declaration required additional corroboration in order to create a genuine disputes of material fact and thereby overcome summary judgment. *See* ECF No. 49 at 39 (complaining about the lack of evidence to "support plaintiff's say-so"); *see also* ECF No. 52 at 14; ECF No. 52-1 at 2. This is incorrect. *See, e.g.*, *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) ("There is nothing in [Rule 56] to suggest that nonmovant['s] affidavit[] alone cannot—as a matter of law—suffice to defend against a motion for summary judgment."); *Pierce v. Rowland*, No. 20-CV-5731, 2021 WL 3929549, at *4 (6th Cir. Sept. 2, 2021) (summary order) ("[T]he rules for summary judgment do not require a plaintiff's affidavit to be corroborated."). At most, URMC has merely identified

12

disputes of material fact pertaining to the various elements of Plaintiff's claim, which must be resolved by "assessing the credibility" of the individuals involved. *Danzer*, 151 F.3d at 57. "At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant," *i.e.*, Mehta, and so is not a basis for judgment as a matter of law. *Id.*

Second, URMC contends that it had "multiple legitimate, non-retaliatory reasons to not renew [Mehta's] appointment." ECF No. 49 at 40. However, as stated in Section I, *supra*, Mehta has produced sufficient evidence that such reasons were either post hoc or knowingly false. Furthermore, the timing bolsters her claim of a connection between her harassment complaint and the nonrenewal decision. Smoller was apparently considering Mehta's nonrenewal in fall 2017, but he waited until April 2018 to formally do so. Smoller cannot explain that delay, but the timing is suspicious: it came just days after Mehta told Chaudron of Smoller's sexual harassment. *See* ECF No. 51-2 at 20. Given the evidence that Mehta had previously been warned that Smoller was "well-liked" and was not "going to be going anywhere," *id.*, a reasonable jury could conclude that Mehta's nonrenewal was a response to her sexual-harassment complaint—an attempt to essentially "circle the wagons," discredit Mehta, and protect Smoller from further scrutiny. Again, URMC's contention that Mehta's allegations are "unsubstantiated" is insufficient to justify summary judgment. *See Danzer*, 151 F.3d at 57.

Accordingly, this claim will proceed to trial.

## CONCLUSION

For these reasons, URMC's motion for summary judgment (ECF No. 45) is DENIED.

IT IS SO ORDERED.

Dated: February 11, 2025
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York

13